STATE OF WYOMING,

*Plaintiff and Respondent,*

vs.

JACK DOBBS,

*Defendant and Appellant.*

(No. 2522; May 13, 1952; 244 Pac. (2d) 280.)

28

For the defendant and appellant the cause was submitted upon the brief of Anderson and Morgan of Gillette, Wyoming, and G. R. McConnell of Laramie, Wyoming, and oral argument by Mr. McConnell.

For the plaintiff and respondent the cause was submitted upon the brief of Honorable Harry S. Harnsberger, Attorney General; Howard B. Black, Deputy Attorney General; Paul T. Liamos, Jr., Assistant Attorney General; all of Cheyenne, Wyoming, and John P. Ilsley, County and Prosecuting Attorney of Campbell County, Gillette, Wyoming, and oral argument by Mr. Harnsberger.

## OPINION

BLUME, Chief Justice.

On August 3, 1950, one William Picha, with his wife Erma Picha, was driving north from Gillette, Wyoming, in a Dodge coupe. When about seven miles north of Gillette, the car stalled and the engine died. So Picha parked his car on the east side of the road, and at least partly off the oiled part thereof. After the car had been parked for about three-quarters of an hour, the de-

fendant Jack Dobbs was driving north on the same road in a truck, arrived at the place where the Dodge car was parked about three o'clock in the afternoon, hit the automobile in the back and penetrated it about eight and one-half feet. As the truck and the car were going diagonally across the oiled part of the road to the west side thereof, Erma Picha fell out of the car and some of the wheels of the truck ran over her. She received mortal injuries and died later in the day. On August 15, 1950, the County Attorney of Campbell County, Wyoming, filed an information against the defendant charging him with unlawfully killing Erma Picha by reckless driving and while under the influence of intoxicating liquor. The information was changed on November 13, 1950, the County Attorney charging the defendant with manslaughter in that he wilfully and unlawfully killed Erma Picha. The defendant pleaded not guilty. The case was tried, the trial commenced on November 13, 1950, and the jury returned a verdict finding the defendant guilty as charged. He was thereupon sentenced to prison and he appealed. Briefly stated, the State claims that the fatal accident happened because the defendant was drunk. The defendant claims, among other defenses, that the accident happened because of defects in the steering wheel of his truck, disenabling him to control it. The State answers that if that was true, he was reckless in driving the truck, and was thus properly convicted.

The information in this case did not set out the manner and means by which the manslaughter was effected and it is contended by defendant that he had a constitutional right to be informed of the means by which the crime charged was accomplished. We have passed on that question twice, namely, in the case of State v. McComb, 33 Wyo. 346, 239 P. 526, and State v. Cantrell, 64 Wyo. 132, 186 P. (2d) 539. Section 10-705 W.C.S. 1945, provides that "in any indictment for man-

slaughter, it shall be sufficient to charge that the defendant did unlawfully kill the deceased." In view of this statutory provision, we held that an information in conformity with the statute is sufficient. In order to hold otherwise, we would be compelled to hold that the statute above mentioned is unconstitutional. We are not inclined to do so and the foregoing objection must accordingly be overruled. Section 9-205 W.C.S. 1945, providing for punishment for manslaughter distinguishes between voluntary and involuntary manslaughter. Whether or not the court should have given instructions and furnished the jury with forms in conformity therewith, which would distinguish between these two forms of manslaughter is a question that has not been argued and does not arise in this case.

Before the trial of the case commenced, the defendant made a motion to quash the jury list and also a motion to quash the panel of 50 jurors summoned for the term upon the ground that approximately 36% of the persons on the jury list, as well as on the panel, were not qualified jurors, in that they were not on the assessment roll as required by statute. At the close of the trial, the defendant moved for a directed verdict for the reason, among others, that a great number of the jurors on the jury list and on the panel were not qualified and "that the Defendant was compelled to exercise all of his peremptory challenges in the case and was compelled to accept jurors that were not desired by the Defendant, but upon whom he could not exercise a peremptory challenge because it was necessary to use the peremptory challenges to remove from the jury the persons who were not assessed upon the assessment roll." All the motions were overruled.

A stipulation was entered into between the State and the defendant at the beginning of the trial stating among other things that the jury list made on January

10, 1950, by the statutory board "contains a great number of names of persons, especially women, who are not assessed on the assessment rolls and assessment schedules of the County of Campbell for the year 1949 * * * the certified list of qualified Jurors on (of) those which have been drawn on the panel is on the ratio of twenty-one women drawn on the panel and of these twenty-one women there are actually only three thereof who are assessed on the assessment roll and assessment record of the County Assessor and County Treasurer of the County of Campbell, State of Wyoming * * * and that of the jury panel as drawn for the September 1950 term, there are only three women whose names appear on the assessment schedules and assessment rolls for the County of Campbell * * * and that in order to save time in not checking the entire assessment of the County of Campbell it is reasonable to believe that the same ratio of persons on the jury list would continue as shown by the jury panel." Counsel for defendant accordingly claimed that there was a mistake of 36%, namely, 18/50th in the jury list and in the panel as above mentioned. The attorney general in his brief in this case asserts that "the county and prosecuting attorney did not and the record does not show that he stipulated that only three of the panel of twenty-one women originally drawn were on the assessment rolls." While the diction of the stipulation dictated into the record is far from being elegant or precise, we think that the stipulation was substantially to the effect as claimed by counsel for the defendant. That is corroborated by other facts stipulated. For instance, it was stated that the court dismissed ten or eleven women who had been summoned on the panel because of the fact that they were not on the assessment roll. The record also shows that four other women on the voir dire examination answered that they were not on the assessment roll and they were accordingly dismissed.

The stipulation and the evidence herein further shows that other women were not on the assessment roll but were retained as jurors because of corrections made in the assessment schedules by the assessor shortly before the trial of the case herein. Assessment schedules do not constitute the assessment roll. Furthermore, the jury list is made up by a board provided by statute as hereinafter mentioned and at the time specified by statute. The assessor could not function as such board and his attempt to correct its errors was useless. The question accordingly before us is as to the effect of the 36% error and mistake in the jury list and in the panel.

Among the qualifications of jurors is that they must be assessed on the last assessment roll of the county, § 12-101 W.C.S. 1945. Section 12-106 W.C.S. 1945, provides: "The chairman of the county commissioners, the county treasurer, and the county clerk, of each county must meet at the county seat of each county at the office of the county clerk on the second Monday of January of each year for the purpose of making a list of persons to serve as trial jurors for the ensuing year. If they fail to meet on the day specified in this section they must meet as soon thereafter as practicable." It may be noted that according to the provisions of this section, if an unlawful list is made when the jury list is originally attempted to be made, a lawful list may be made thereafter. State v. Bolln, infra. That, however, was not done in the case at bar. The names on the list so made up by the board are placed in what is called "jury box number 1", § 12-109 W.C.S. 1945. It would seem that in the case at bar the panel of 50 was drawn from jury box number 1. Hence, it is not necessary herein to consider other provisions of the statute with reference to jurors.

In State v. Bolln, 10 Wyo. 439, 470; 70 P 1, the court among other things stated: "But, at the same time,

under the legislation upon the subject in this State, it is a necessary qualification of a juryman that he must have been assessed upon the last assessment roll of the county, and no authority is conferred upon the jury commissioners to make a jury list except from the assessment roll. It is also necessarily implied in the statute that the jury list shall consist of the names on the assessment roll of all persons whom the commissioners believe to be competent and qualified to serve. And we think a substantial compliance with these requirements is necessary * * * From the very nature of the duties imposed upon the jury commissioners, it is impossible to frame an accurate definition, applicable in all cases, of what would constitute a substantial compliance with the statute. By the terms of the act, they are required to place upon the list only those whom they believe to possess the qualifications of jurymen. This language commits that question to their judgment and decision, and it is no ground for an attack upon a list so made up that others might disagree with them in regard to the qualification of persons whose names appear in the list or of others whose names have been omitted. But it is beyond controversy that an intentional disregard of the statute, by reason of an erroneous interpretation of its provisions, or otherwise, cannot be deemed a substantial compliance with it."

The holding in that case was reaffirmed in Meldrum v. State, 23 Wyo. 12, 146 P. 596, Johnson v. State, 29 Wyo. 121, 211 P. 484, State v. Radon, 45 Wyo. 383, 19 P. (2) 177. And the rule in this state appears to be the general rule as announced by the decisions in other states. Thus the court stated in People v. Boston, 309 Ill. 77, 139 N.E. 880, 882, as follows: "Mere irregularities in failing to comply strictly with the provisions of the statute which are not prejudicial to the parties do not invalidate the list, but a substantial compliance

with the law is necessary, and a disregard of the material provisions which make up the essential features of the system and are designed to secure and preserve a fair and impartial trial is not a mere irregularity and is ground for challenging the array. Where no attempt has been made to select a jury in accordance with the requirements of the statute, as the record shows to be the fact in this case, the challenge to the array must be sustained."

In the case of Green v. State, 59 Md. 123, 43 A.R. 542, 544, the court stated: "The general method prescribed for drawing juries is mandatory, and substantial compliance with the provisions thereof in respect to the selection and drawing of jurors is necessary to make the jury a legal one; and unless the selections are made by the judge in the manner pointed out by the statute exception at the proper time, and in the proper way, may be successfully taken to a jury improperly chosen or drawn; otherwise the statutory provisions would be wholly nugatory."

In 50 C.J.S., § 159, p. 883, it is stated: "where the statute specifically prescribes the class of persons from whom the list is to be selected, a failure to select the list from this class is a fatal irregularity." In 50 C.J.S., § 175, p. 902, it is stated: "On the other hand any substantial and material departure from the methods prescribed by statute, such as would probably produce a change in the panel or present a list of names different from that which would be produced by compliance with the law, is ground for challenge to the array. Some attempt at substantial compliance with the statute must be made, and if there is none a challenge to the array should be sustained even though no prejudice is shown." Numerous other authorities announce a similar rule as that herein stated. Sufficient has been shown that the trial court was, under the facts herein, in error in think-

ing that the defendant was required to show prejudice before his motions were sustained. It would seem in this case that, for some unexplainable reason, the board above mentioned put on the list of jurors the names of women indiscriminately, apparently thinking that because women became qualified as jurors under Chapter 61 of the Session Laws of 1949, any and all women could be put upon the jury list. But the chapter specifically provides that while women are qualified as jurors they must be assessed on the last assessment roll of the county, so that it is difficult to understand how the mistake shown herein could have been made. Courts are hesitant to reverse a case merely because of some irregularities in the selection of jurors but the question before us is as to whether or not the mistake of 36% may be considered as a substantial compliance with the provisions of the statute. Reluctant as we are to reverse the case on the ground above mentioned, if we are to leave any meaning to our statute at all we are unable to see how we can hold that as great a mistake as was made in this case was a mere irregularity. As stated in People v. Mack, 367 Ill. 481, 11 N.E. (2d) 965, 969, that: "When the substantial parts of provisions for the selection of jurors are violated such violations are those of substance and not merely of form amounting only to irregularities." The motions to quash made by the defendant should have been sustained.

The defendant asked the court to give the following instruction: "The Court instructs the Jury that the term 'under the influence of intoxicating liquor' means that the defendant has consumed malt or spirituous liquor to such an extent as to impair his condition of thought and action and cause him to lose the normal control of his faculties." The court refused to give the instruction and gave no instruction on the subject whatever. It is claimed that this was reversible error.

After the reading of the cold record before us, it is hard to understand how the shocking and fatal accident herein happened. The Dodge automobile stood on the side of the road and was visible to the defendant for a long distance. It would seem that with the truck in proper condition, the Dodge automobile should have been easily by-passed by the defendant, even though he was intoxicated, unless he was almost "completely out" by reason of intoxicating liquor of which there is no evidence, although we do not know whether the shock of the impact sobered him. The witness Delano Hladky saw the truck coming, though only momentarily, and he testified that it was weaving on the road. That would be consistent with the defendant being drunk, but it was also consistent with the fact that his steering wheel was out of order. There is evidence that it was fixed in Gillette. But we know that mechanics do not always do their work perfectly. It may be that when the defendant found, on his way out of Gillette, as he testified, that the steering wheel had not been properly fixed, he was guilty of negligence in not turning back, leading to civil liability. But when a man is on the road going home, his hopes are for the best, and he hates to turn around and go back, and we are not at all certain that a jury would convict him of criminal negligence by reason alone of the failure to do so. Hence it would seem that the jury in all probability convicted him because of being under the influence of intoxicating liquor and the question of the meaning of that term, unless well known, became of vital importance herein.

The cases are not in harmony as to whether an instruction defining the term should be given. While the giving of such an instruction seems to be a not uncommon practice, the courts in Texas and Missouri hold that it is not necessary. Blashfield, Cyclopedia of Auto-

mobile Law and Practice, Perm. Ed. Vol. 8, p. 547 to 548. The court in Oklahoma was originally inclined to hold likewise. Welch v. State, 43 Okl. Cr. 47, 277 P. 280. Upon further consideration, however, the court held otherwise. In the case of Luellen v. State, 64 Okl. Cr. 382, 81 P. (2d) 323, 328, the court stated referring to the former Oklahoma case as follows: "This court, as it is now constituted, is not prepared to say that the above statement is wrong as a matter of law, but we do think it is much better for the court to give an instruction defining this term, so the jury may have some conception and understanding of what the law considers being 'under the influence of intoxicating liquor.' This is the very gist of the crime. Without it being defined one Juror may construe it to mean that a party must be 'drunk' another that he be 'completely out' and devoid of reason, another may construe it to mean that if it is proven that he has taken one drink that he is therefore 'under the influence of intoxicating liquor'. For this reason we believe it best for the court to define the term, so that the jury may know what the law considers as one being under the influence of intoxicating liquor. A definition of this term will in our opinion defeat many mistrials in cases brought under this statute. It is a well known fact that intoxicating liquor has a different effect upon the system of different parties. Some persons may drink a quantity of liquor, and still be in their normal senses, others with a very limited quantity will be completely out. Some people are not so much affected by the drinking of beer, others become completely drunk by the drinking of the same. These are all questions to be determined by the jury, under proper evidence, and proper instructions, to meet the issues of each case." In the subsequent case of Phenis v. State, 76 Okl. Cr. 156, 135 P. (2d) 62, 65, the court took an even stronger position and stated as follows: "this court, in the case of Luellen v. State, 64 Okl. Cr.

382, 81 P. (2d) 323, stated that we now think in cases of this character this term should be defined to the jury. In that case we quoted an instruction which we think fully covers the same. As stated in that opinion, this term constitutes the very gist of the charge. There is a great divergence of opinion among jurors as to what facts it takes to constitute one being under the influence of intoxicating liquor. If it is necessary to define the term 'murder' when one is charged therewith, certainly it should be necessary to define what is meant by the term 'under the influence of intoxicating liquor,' when one is so charged." And a still later case adhered to the decisions. Powell v. State, 88 Okl. Cr. 404, 203 P. (2d) 892. We are inclined to believe that we should align ourselves with the holding of the Oklahoma court, at least when the crime involved is that of a felony. Counsel for the State say that to have given the instruction asked would have confused the jury. They do not point out how such confusion could have arisen. The instruction is substantially in conformity with decisions in other cases. Thus it was said in the case of State v. Revard, 341 Mo. 170, 106 S.W. (2d) 906, 910, that: "the words refer to the impaired condition of thought and action and the loss of the normal control of one's faculties." So in the case of Lockhart v. State, 108 Tex. Cr. 597, 1 S.W. (2d) 894, it is said that the term "under the influence of intoxicating liquor" means "that a person has taken into his stomach a sufficient quantity of intoxicating liquor so as to deprive him of the normal control of his bodily or mental faculties."

Numerous other errors are assigned herein but they may not arise again in another trial and we think it is not necessary to take the time or space in discussing them.

In view of the errors herein pointed out the conviction and judgment of the trial court are reversed and

the cause is remanded to the District Court of Campbell County, Wyoming for a new trial.

*Reversed and remanded for new trial.*

RINER, J. and ILSLEY, J., concur.